UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY I HUDSON,
PLAINTIFF

VS.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,
DEFENDANT

CASE NO. 1:06CV664
(DLOTT, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed her applications for Disability Insurance Benefits and Supplementary Social Security Income in June, 2003. Her application was denied, both initially and upon reconsideration. Plaintiff requested and obtained a hearing before an Administrative Law Judge at Cincinnati, Ohio, in January, 2006. Plaintiff, who was represented by counsel at the hearing, testified as did Vocational Expert (VE), Dr. George Parsons. The ALJ reached an unfavorable decision in May, 2006, following which Plaintiff processed an appeal to the Appeals Council. In August, 2006, the Appeals Council denied review. In October, 2006, Plaintiff timely filed her Complaint with this Court seeking judicial review of the final order of the Social Security Administration.

## STATEMENT OF ERRORS

Plaintiff asserts two Statements of Error, which will be more simply stated here. First, Plaintiff asserts that the ALJ erred by allocating insufficient weight to the opinion of Plaintiff's treating physician, Dr. Muhammad Kaleem. Second, Plaintiff asserts that the ALJ erred by concluding that Plaintiff had the residual functional capacity to perform work on a full-time basis.

### PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was 47 years of age and was living with her parents, who are her sole source of support and are on food stamps themselves. She graduated from high school and took vocational classes, but has lived almost exclusively in her parents' home on Five Points Fincastle Castle Road in Sardinia, Ohio, since birth. She is a licensed driver, but seldom drives. She complained of asthma and a "bad right knee," coupled with the lack of transportation, which are the reasons why she is unable to work. She hasn't worked for the past 15 years. She complained of an inability to breathe and chronic swelling and lack of stability in her right knee. She wears a patch prescribed by Dr. Kaleem for knee pain and has undergone physical therapy. She uses an inhaler for breathing problems, which she has had since childhood and wears a mask when she goes outside.

Plaintiff testified that she has trouble handling money because she "can't count very good." She helps her mother cook and do laundry. Plaintiff also related that she had been in counseling, but lacks the funds to continue. The examination of Plaintiff was very brief and not terribly helpful to the resolution of her case.

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTIONS

The ALJ's first hypothetical asked the VE to assume the following:

(1) the ability to lift, carry, push or pull up to 12 lbs., (2) no limits on standing, walking or sitting, (3) the ability to frequently climb stairs or ramps, balance, kneel and crouch, (4) the ability to crawl or crouch on occasion, (5) clean environment required with no exposure to temperature extremes, excessive humidity, dust, fumes or strong odors, (6) work limited to routine, repetitive tasks with simple instructions and no math, (7) work environment must be stable with little or no change, (8) no contact with the general public and only occasional contact with co-workers.

The VE responded with a representative number of jobs in the national economy, such as assembler, packer, and production worker.

The ALJ's second hypothetical kept all the requirements of the first, but raised the exertional limits to 20 lbs. on occasion, and 10 lbs. frequently. In other words, the second hypothetical restricted Plaintiff to light, rather than sedentary work. The VE responded, as one might expect, with an increased number of jobs, including those in the food service industry, such as dishwasher and

cafeteria worker.

The third hypothetical asked the VE to assume all the restrictions of the second hypothetical and add the assumption that Plaintiff could only sustain persistence and concentration for 45 minutes out of an hour. The VE responded with this comment: "She probably wouldn't be able to work very long." Upon cross-examination, the VE admitted that someone functioning at a slower pace would have some difficulty performing production or assembly type jobs.

## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff has severe impairments of cutaneous lupus erythematosis, asthma, depression, borderline intellectual functioning, and a math disorder. The ALJ found that Plaintiff has no Listing level impairment, considered either alone or in combination. The ALJ found that Plaintiff has the residual functional capacity to perform a number of jobs at the light or sedentary level with the restrictions indicated in the first two hypothetical questions to accommodate her various impairments.

## THE MEDICAL RECORD

Plaintiff was diagnosed with Lupus in August, 2003, by Diane Durket, M.D., who practices internal medicine in Georgetown, Ohio with Dr. Kaleem. (Tr., Pgs. 122-123). Plaintiff was evaluated by physical therapist Jeremy Snyder at Brown County General Hospital in July, 2003. At that time, Plaintiff reported that "my knees ache." The referral to physical therapy was the recommendation of Dr. Kaleem, Plaintiff's primary care physician, who previously diagnosed her with Lupus and asthma. At the conclusion of the rather extensive evaluation, therapist Snyder commented as follows: "Patient fatigued at the end of most tasks, but completed them all with little to no difficulty. I would struggle to find much overall limitation functionally for Mary other than just slightly reduced endurance." (Tr., Pgs. 150-159). In February, 2003, the diagnosis of Tumid Lupus Erythematosus was made from an elipse of skin taken from Plaintiff's right arm by pathologists at the Richfield Laboratory of Dermatopathology. (Tr., Pgs. 177-178). Then Steven Estes, M.D., a dermatologist, reported to Dr. Kaleem in February, 2003, that Plaintiff had Lupus Erythematosus and that he would prescribe Plaquenil. (Tr., Pg. 179).

Because of her Lupus problems, Plaintiff was referred to Ramesh Kode, M.D., an

opthamologist, whose examination resulted in a finding of ocular pressure and suspected Glaucoma due to Lupus. There is a family history of Glaucoma. (Tr., Pgs. 181-186).

Norman Berg, a clinical psychologist, evaluated Plaintiff in November, 2003. Dr. Berg placed Plaintiff in the "borderline range of intelligence" and felt that she was "no more than slightly anxious" and "slightly to mildly depressed." Dr. Berg opined that Plaintiff would have no limitations of her ability to understand and follow simple verbal directions and no limitations of her ability to attend and concentrate. She would have mild limitations of her ability to socially relate and to sustain a level of activity. Her ability to cope with stress would be mildly to moderately limited. He assigned a GAF of 63 and rated her math skills as "poor." (Tr., Pgs. 196-200).

Another psychological evaluation was done by Bonnie Katz, Ph.D. and Deryck Richardson, Ph.D., in January, 2004. They diagnosed her with a math learning disorder, an adjustment disorder with depressed mood, and borderline intellectual functioning. Drs. Katz and Richardson felt that Plaintiff's restriction of activities of daily living was moderate as was her difficulty in maintaining concentration, persistence or pace, but she only had a mild limitation of her ability to maintain social function. The only marked limitations were in relation to Plaintiff's ability to understand, remember and carry out detailed instructions. In summary, the two psychologists felt that Plaintiff "can understand, remember and carry out simple tasks. She can make very simple decisions. She can relate to coworkers and supervisors on a superficial and occasional basis and would be able to deal with the public on a limited basis only. She can deal with occasional changes in routine. She would require a calm, consistent setting with clear performance expectations." (Tr., Pgs. 203-232)

Dr. Kaleem referred Plaintiff to the Arthritis and Rheumatic Disease Center and specifically to Hana Badreddine, M.D. for management of her Lupus Erythematosus. Dr. Baddreddine recommended an increased dosage of Plaquenil. (Tr., Pgs. 251-252 and 259).

An x-ray of Plaintiff's right knee in July, 2004, showed "intact soft tissues" and "no evidence of fracture or dislocation." (Tr., Pg. 290). A repeat x-ray in September, 2004, demonstrated "no interval acute deformities, no significant particular erosions, degenerative changes or spurring." (Tr., Pg. 295). X-rays of both knees in June, 1997, were normal. (Tr., Pg. 314).

In January, 2002, Plaintiff was seen in the emergency room of Brown County General Hospital for an alleged sexual assault which occurred 10 months previous at the hands of her OB/GYN doctor. A dream resurrected the experience. Bryan Stegman, M.D. recommended that she

report the incident to the police. (Tr., Pgs. 347-348).

Plaintiff was evaluated by Dr. Kaleem in March, 2004. Dr. Kaleem opined that Plaintiff could stand/walk for 5-6 hours during a workday, but would require an interruption every 10 minutes. He also said that Plaintiff could sit for 5-6 hours during a workday, but would require an interruption every 15 minutes. She could lift/carry 21-25 lbs. frequently. Her limitations on pushing, pulling, bending, twisting and handling are not significant. Dr. Kaleem expressed the opinion that Plaintiff's limitations would last for 12 months or more and that she was "unemployable." He rated her limitations on 19 functions as "moderate", but rated as "marked" only Plaintiff's ability to ask simple questions or request assistance. (Tr., Pgs. 402-405). In November, 2005, Dr. Kaleem again evaluated Plaintiff. This time, Dr. Kaleem estimated that Plaintiff could occasionally lift and carry 12 lbs., but push/pull up to 40 lbs. He indicated that neither sitting nor walking/standing were affected by her impairment. Dr. Kaleem indicated that Plaintiff could occasionally crawl and stoop, but could frequently climb, balance, kneel and crouch. Her ability to see was limited as was her ability to tolerate temperature extremes, noise, dust, vibration, humidity, hazards and fumes. (Tr. 424-427).

In January, 2006, Pranav Sheth, M.D., reported that there was "no evidence of active lupus over the past 1 year." (Tr,. Pg. 440).

## OPINION

In her first Statement of Errors, Plaintiff faults the ALJ for not following the assessment of Dr. Kaleem, Plaintiff's primary care physician that Plaintiff is "unemployable." Her medical record is fully supportive of the fact that Plaintiff has Lupus Erythematosus. Dr. Burket diagnosed that condition as did Drs. Kaleem, Estes and Badreddine. The analysis of a skin sample by the Richfield Laboratory of Dermatopathology confirmed the diagnosis and Plaintiff was given Plaquenil, an appropriate medication for control of that disease, and one which was effective in controlling Plaintiff's condition as illustrated by Dr. Sheth's January, 2006, note that there was no evidence of active Lupus for more than a year. When Plaintiff was asked why she felt she could not work, she mentioned asthma, a "bad" right knee and an inability to obtain transportation. The absence of any mention of Lupus along with Dr. Seth's conclusion is telling. The ALJ made no error by concluding that Plaintiff's Lupus was not a major obstacle to her ability to work.

It has also been established that Plaintiff has asthma. Drs. Kaleem and Burket made that diagnosis, and it was confirmed by pulmonary function tests performed at Brown County General Hospital in June, 1996. Dr. Kaleem's office notes indicate that Plaintiff was given a Proventil inhaler and that her asthmatic condition was stable. She wears a mask when outside. Office notes repeatedly refer to Plaintiff's asthma as "stable." We understand that when a physician refers to a condition as "stable," he or she often means that the condition is unchanged from the last test or office visit, and that the use of the term is not necessarily indicative of a minor problem. However, Dr. Kaleem also used the term "controlled" to indicate that Plaintiff's asthmatic condition was under control and not debilitating. The ALJ was careful to restrict Plaintiff to jobs not exposing her to dust, fumes, or temperature extremes.

Plaintiff also suffers from chronic right knee pain, but multiple x-rays over a seven-year period from 1997 to 2004 fail to show an objective basis for Plaintiff's complaint of knee pain and instability. The medical record fails to show any evidence of an accident or prior surgery that would be a logical stimulus for chronic knee pain. Nevertheless, Plaintiff complained of right knee pain, and Dr. Kaleem referred her to physical therapy for strengthening her knees, so he must have felt that there was some arthritic or degenerative problem. In any event, after completing a rather thorough evaluation involving multiple physical tests, the physical therapist indicated that Plaintiff was somewhat fatigued and lacked a great degree of endurance, but the therapist could not find any functional limitations and Plaintiff was able to complete all tasks.

The ALJ found that Plaintiff suffered from borderline intelligence. This is apparent from a brief reading of Plaintiff's responses to a Social Security questionnaire found at Pages 73-83 of her medical record. Dr. Berg examined Plaintiff in November, 2003 and his opinion, along with the opinion provided by Drs. Katz and Richardson, provided the ALJ with the conclusion that this was indeed the case. The only evidence slightly to the contrary comes from Plaintiff herself that she is a high school graduate who never attended special education classes. A related impairment is Plaintiff's difficulty with mathematics, demonstrated by Dr. Berg's diagnosis of a Math Disorder, a diagnosis agreed upon by Drs. Katz and Richardson. The ALJ accommodated this obvious limitation by restricting Plaintiff to simple task involving simple instructions and no math.

The ALJ found that Plaintiff was depressed because all the clinical psychologists agreed that Plaintiff suffered from depression, although Dr. Berg's conclusion that Plaintiff was "slightly to

mildly depressed" seemed somewhat at odds with Plaintiff's description of herself as having little work experience, living with and being dependent upon her parents despite being in her forties and being socially isolated with few friends. However, Plaintiff considered the questions of Drs. Katz and Richardson on the subject of her mental or emotional problems to be "not applicable" and as a result there is not much information is this record to rebut Dr. Berg's conclusion that her depression is on the mild side. In any event, the ALJ accommodated this impairment by limiting Plaintiff to a stable work environment with little contact with co-workers and supervisors.

Despite this cumulative body of proof assembled by other physicians and psychologists, Dr. Kaleem considers Plaintiff "unemployable." Dr. Kaleem provided two residual functional capacity assessments, one in March, 2004, and the other in November, 2005. Despite the temporal relationship between the assessments, they are quite different for unexplainable reasons. In November, 2005, Dr. Kaleem stated that walking and/or standing were unaffected by Plaintiff's impairment and that she could frequently climb, balance, kneel and crouch. He said that she could lift and carry no more than 12 lbs. Twenty months previous, Dr. Kaleem said that Plaintiff could lift/carry up to 25 lbs., both frequently and occasionally, but that she would require much more frequent breaks while sitting than she would while walking or standing. This evaluation makes little sense since Plaintiff never complained of spinal problems or back and neck pain, but only complained of her right knee pain and instability. In any event, Dr. Kaleem's most recent evaluation does not support any conclusion that Plaintiff has functional limitations and physical therapist Snyder's evaluation agrees. If Dr. Kaleem made his assessment based on his observations that Plaintiff showed signs of anxiety and depression, substantial evidence supports the fact that Plaintiff has these symptoms, but not to any significant or serious degree. Dr. Kaleem rated only Plaintiff's inability to ask questions or seek assistance as marked; the remainder of the 19 listed deficiencies he rated as moderate.

The ALJ found that none of the above impairments met any Listing, either when considered alone or in combination. We believe the ALJ's conclusion was the correct one.

In her second Statement of Errors, Plaintiff asserts that she did not have the endurance or stamina to sustain full time work. There is a base of evidence in this record that Plaintiff has endurance or fatigue issues. Physical therapist Snyder reported that Plaintiff was fatigued at the end of his physical therapy evaluation, but Plaintiff did not testify about fatigue being a problem for her,

although she did complain of fatigue to both Dr. Badreddine and Dr. Kaleem. Plaintiff's life style certainly does not lead one to conclude that she is a person with a high energy level. She takes prescription medication and complains that it makes her drowsy, but there are no medical opinions to indicate that she suffers from fatigue to the extent that she cannot perform the requirements of light or even sedentary work on a full-time or sustained basis, other than the fact that she has not worked for a fifteen year period. We understand that depression and fatigue are often symptoms that accompany one another, but the record evidence does not suggest that Plaintiff's depression is a major obstacle to full-time remunerative employment.

Plaintiff has not worked for a considerable period of time. It may be true that the reason is that she cannot. An equally valid inference is that she does not because her parents support her. The burden of proof is upon the applicant for benefits to demonstrate that she is entitled to them. She has simply failed to so demonstrate. Substantial evidence supports the decision of the ALJ in this case that Plaintiff has not shown that she is disabled and unable to work.

For all these reasons, the decision of the Commissioner should be AFFIRMED and this case should be DISMISSED form the docket of this Court.

March 7, 2008

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY I HUDSON,
      PLAINTIFF

CASE NO. 1:06CV664
(DLOTT, J.)
(HOGAN, M.J.)

VS.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,
      DEFENDANT

## NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 3-7-08 . Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).